**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY P. SUNDQUIST, JR., | Case No. 1:24-cv-00719 JLT HBK |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS OR STRIKE |
| v. | |
| ALLSTATE INSURANCE COMPANY, et al., | (Doc. 9) |
| Defendants. | |

Jeffrey Sundquist, Jr., alleges that Allstate Insurance Company wrongly denied his claim for benefits under an uninsured and underinsured motorist policy.  He is pursuing claims for breach of contract and bad faith denial, and he proposes to litigate his claims on behalf of a class of people whose claims Allstate rejected on the same basis.  Allstate moves to dismiss for lack of jurisdiction, it moves to strike the class allegations, and it moves to dismiss for failure to state a claim.  (Doc. 9.)  The Court **GRANTS** the motion **IN PART**.  Sundquist has standing to pursue claims against Allstate, but his allegations do not show he has standing to pursue claims against entities other than Allstate, whether on his own behalf or on behalf of a class.  The Court otherwise **DENIES** the pending motions.

**ALLEGATIONS**

In 2018, an intoxicated man drove head-on into a vehicle that Sundquist and three of his

1

coworkers were taking back from a worksite. (*Id.* ¶ 73.) Two of the coworkers were killed. (*Id.*) Sundquist and his surviving coworker sustained serious injuries. (*Id.*) The intoxicated driver was insured under a policy issued by a company other than Allstate, and that policy included only the statutory minimum coverage for bodily injury, i.e., $15,000 per person, up to a maximum of $30,000 per occurrence. (*Id.* ¶ 74.) Sundquist, his surviving coworker, and the families of the two coworkers who died ultimately agreed to divide the $30,000 limit. (*Id.* ¶ 75.) Sundquist received $9,999. (*Id.*) He also received about $50,000 in workers' compensation benefits, including medical payments and permanent and temporary disability payments. (*Id.* ¶ 76.) But workers' compensation benefits did not cover Sundquist's pain and suffering and other similar damages. (*Id.* ¶ 77.) He estimates his losses for these types of harms are "well over $300,000." (*Id.* ¶ 77.)

Sundquist's employer had purchased a business automobile policy from Allstate. (*Id.* ¶ 78.) He pursued a claim for coverage under this policy without success. Allstate initially denied coverage based on its assertion that its insured "was not responsible for the accident." (*Id.* ¶ 82.) Several months later, however, it acknowledged the policy provided coverage under its uninsured and underinsured motorist provisions, but reserved the right to "offset" several categories of payments, including payments from other insurers and workers' compensation benefits. (*Id.* ¶¶ 87–91.) After several more months, Allstate informed Sundquist it had concluded that "between the underlying tort policy and the amounts paid by work comp there would be no remaining Underinsured exposure as [its] policy carries a $100,000 combined UIM limit." (Id. ¶ 94.) It did not offer more specific information. (*Id.*)

In September 2021, after further correspondence, Allstate denied the claim for a third time, citing the "tort limits" of $30,000 and the total workers' compensation payments of about $250,000 that had been paid in connection with the crash. (*Id.* ¶ 99.) It did not cite any policy provisions or statutes to support this reasoning. (*See id.* ¶ 100.) At this point, more than three years had passed since Sundquist was injured in the crash. (*See id.* ¶¶ 73, 99.) He alleges Allstate's denial letters and delays were part of a "standard operating procedure" designed to stifle valid claims. (*Id.* ¶ 96.)

2

After Sundquist's attorneys exchanged further correspondence with Allstate's in-house counsel, the insurer ultimately retained an outside attorney, who explained in a November 2023 letter that it had denied Sundquist's claim "because the workers' compensation benefits that were paid to the claimants," i.e., the total sum paid to all four people in the car, "exceeded the amount of UIM limits provided by the policy." (*Id.* ¶ 117.)  Allstate's counsel cited "Insurance Code section 11580.2(p)(4)." (*Id.* ¶ 118.)  Under that subdivision, "the maximum liability of the insurer providing the underinsured motorist coverage shall not exceed the insured's underinsured motorist coverage limits, less the amount paid to the insured by or for any person or organization that may be held legally liable for the injury."  Cal. Ins. Code § 11580.2(p)(4).  Allstate's counsel also cited section D.2 of the policy's uninsured motorist endorsement, which uses similar language: "our Limit of Insurance shall be reduced by all sums paid because of 'bodily injury' by or for anyone who is legally responsible." (Docs. 1-1 ¶ 118; 9-1 at 5.)  In short, it was Allstate's position that the $30,000 insurance payment and the $250,000 workers' compensation payments were paid by someone who was "legally liable" or "responsible" under the Insurance Code and its policy and thus completely offset the $100,000 policy limit.

Sundquist does not contest the $30,000 reduction. (*See id.* ¶ 109.)  He alleges in this lawsuit that Allstate was wrong to interpret the statute and policy as permitting the larger reduction for the workers' compensation payments, and he alleges the company's evolving explanations—and its ultimate denial—were in bad faith. (*See* Doc. 1-1 ¶¶ 199–234.)  In addition to these individual claims, he proposes a class action on behalf of people with similar claims:

> All persons insured under one or more automobile policies providing for UM/UIM coverage and issued in California by any Defendant, and who filed a UM/UIM claim under that policy, and where either:
>
> (1) there was a reduction or denial in benefits and/or settlement proceeds based in whole or in part on amounts paid or payable to another insured of Allstate under a workers' compensation law; or
>
> (2) there was a reduction or denial in benefits and/or settlement proceeds based in whole or in part on amounts paid or payable to the insured under a workers' compensation law, and the policy contains language stated that the insurer will not pay for an "element of 'loss'" if the person is entitled to receive payment for the same "element of 'loss'" under a workers' compensation, disability benefits or similar law.

3

(*Id.* ¶ 171.)  Not only would the proposed class pursue these claims against Allstate.  Sundquist also named several defendants who did not issue policies to him or his employer.  These defendants include the holding company that owns Allstate, the parent company of that holding company, and several other affiliated entities that are part of "the Allstate Insurance Group."  (*Id.* ¶¶ 19–20, 23–36.)  He alleges these companies all "process claims according to the same (or materially identical . . . ) principles, policies, procedures, and practices" that led Allstate to deny his claim.  (*Id.* ¶ 22.)  He asks to certify a class to pursue damages under Rule 23(b)(3) and a class to pursue an injunction under Rule 23(b)(2).  (*Id.* ¶ 195.)

After Allstate removed the case to this court, it moved to dismiss Sundquist's claims for lack of standing under Federal Rule of Civil Procedure 12(b)(1), it moved to dismiss his claims under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and it moved to strike his class allegations under Rules 12(f) and 23(d)(1)(D).  (Doc. 9.)  Sundquist filed an opposition (Docs. 12, 12-1) and Allstate a reply (Doc. 13.)  The Court has decided the matter on the papers, without a hearing.  (*See* Doc. 10.)

## JURISDICTION

The Court begins with Allstate's argument that Sundquist lacks standing.  "Under Article III of the Constitution, plaintiffs must have a 'personal stake' in a case to have standing to sue." *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 519 (2026) (quoting *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 379 (2024)).  "To bring suit, a plaintiff must plead an injury in fact attributable to the defendant's conduct and redressable by the court." *Tyler*, 598 U.S. at 636.  When a defendant moves to dismiss based on the complaint's allegations, the court assumes those allegations are true. *See id.*

Sundquist alleges Allstate has wrongfully withheld policy benefits from him and has caused him further harm by denying his claims in bad faith.  He requests damages and an injunction.  This is "a classic pocketbook injury." *Id.*  He has standing.  Allstate objects that he does not have standing because he is not entitled to any payments under the policy's terms or California law.  (*See* Doc. 9 at 10–29.)  Even if Allstate is right and Sundquist has no valid claims, this court has the power to adjudicate that dispute. *See Steel Co. v. Citizens for a Better*

*Env't*, 523 U.S. 83, 89 (1998).  It is not Sundquist's burden to prove his injury or disprove Allstate's defenses at this early stage.  He has "plausibly pleaded on the face of [his] complaint that [he] suffered financial harm from [Allstate's] action, and that is enough for now."  *Tyler*, 598 U.S. at 637.

But the parties' disagreement is a bit more complex than this.  As noted above, Sundquist also alleges that Allstate's corporate affiliates harmed their policy holders—other people, the members of the proposed class—and he asks to pursue claims on their behalf as well under Rule 23.  Allstate contends in response that Sundquist does not have standing to sue its corporate affiliates if those affiliates did him no wrong.  (Doc. 13 at 6–9.)  That is true, at least in the general sense: "named plaintiffs generally lack standing to sue defendants that have not injured them personally, even if they allege that those defendants injured absent class members."  *Martinez v. Newsom*, 46 F.4th 965, 970 (9th Cir. 2022).  A plaintiff who did not buy a policy from a given insurer and who does not allege that insurer owes him any payments cannot demonstrate "the requisite injury" to show the court has jurisdiction to adjudicate the claim against it.  *Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1001–02 (9th Cir. 2001); *see also Homampour v. Blue Shield of Cal. Life & Health Ins. Co.*, No. 15-05003, 2016 WL 7406443, at *7 (N.D. Cal. Dec. 22, 2016) (collecting authority).

In some cases, however, class certification disputes are "logically antecedent" to jurisdictional disputes.  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997)).  If so, those disputes can and sometimes should be addressed first.  *See id.*  This does not mean a court can assume the plaintiff has standing, and thus that it has jurisdiction, in order to resolve the case on the merits because it is fairer, simpler, or more efficient to do so.  *See Steel Co.*, 523 U.S. at 93–94.  "Ordinarily," any Article III court "must be sure of its own jurisdiction before getting to the merits."  *Ortiz*, 527 U.S. at 831.  But if, in a given case, the jurisdictional problems "would not exist but for the class-action certification," then the court can address the class certification issue first if that issue is "dispositive."  *Amchem*, 521 U.S. at 612 (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 623 (3d Cir. 1996)).

The Ninth Circuit followed this style of reasoning a few years ago in *Martinez*, cited above. *See* 46 F.4th at 970–72. Its opinion in that case illustrates a few useful principles about class actions and standing, so it is worth reviewing in some detail.

A group of parents and students alleged that California schools had not adequately accommodated children with special needs during the COVID-19 pandemic. *Id.* at 968. They filed a class action lawsuit on behalf of "all special needs students and their parents in California" and sued "hundreds of defendants," including "every school district in the state of California." *Id.* at 969. The Circuit concluded that the plaintiffs lacked standing to sue districts in which they had not enrolled and schools they did not attend, but it went on to address a class certification dispute that, in the plaintiffs' telling at least, would have given the court jurisdiction. *See id.* at 970–71.

Several years before, in the early 1970s, the Circuit had held that named plaintiffs who have not been harmed by a particular defendant cannot normally be a "typical" and "adequate" representative of the class members with claims against that defendant under Rule 23(a). *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973). The Circuit nevertheless recognized that there might be an exception to this general rule when all of the defendants are "juridically related in a manner that suggests a single resolution of the dispute would be expeditious" or when "all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury." *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973). It cited cases in which classes of plaintiffs had sued local governments or officials for following mandatory and discriminatory state rules, and it referred to an antitrust case about a conspiracy to discriminate against African American buyers in real estate transactions. *See id.* at 469–70.

The named plaintiffs cited *La Mar* in *Martinez*. 46 F.4th at 971. And so, although the Ninth Circuit concluded in *Martinez* that it lacked jurisdiction to adjudicate the named plaintiffs' claims against schools they did not attend, it nonetheless went on to decide whether the "juridical link" doctrine discussed in *La Mar*, and thus Rule 23 in turn, could support the named plaintiffs' theory of jurisdiction. *See* 46 F.4th at 971–92. It could not. The named plaintiffs' allegations did

6

not show the defendants were "linked" in a way that would permit them to rely on the exception discussed in *La Mar*, and again, the Circuit did not hesitate to reach that conclusion, despite its certitude that the plaintiff lacked standing, and despite one concurring judge's view that the "juridical link" doctrine is completely invalid. *See id.* at 972; *see also id.* at 977 (Lee, J., concurring). In this sense, the court's Rule 23 analysis followed a path like the one the Supreme Court traced out in *Amchem* and *Ortiz.* The class certification analysis was essentially dispositive because it showed the court could not entertain claims against schools that no named plaintiff had attended. *See also, e.g.*, *Easter v. Am. W. Fin.*, 381 F.3d 948, 962 (9th Cir. 2004) (reaching "juridical link" dispute despite the named plaintiffs' lack of standing to sue trusts that had never held their disputed notes).

Sundquist interprets *La Mar* and the "juridical link" exception more broadly than this. He argues that this Court not only can take up the Rule 23 dispute as a logical antecedent to a jurisdictional dispute, but in fact should (or perhaps must) decide first whether it is appropriate to certify a class action. (*See* Doc. 12-1 at 25–26.) Some courts in other federal circuits have relied on similar reasoning to hold that class certification disputes about links between defendants can and should sometimes be resolved before the court decides whether the plaintiff or the proposed class have standing, citing *La Mar*. *See Payton v. County of Kane*, 308 F.3d 673, 681–82 (7th Cir. 2002); *see also, e.g.*, *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 268–70 (D. Mass. 2004) (agreeing with and following this holding).

There are good reasons to give this broader theory of class standing a careful look. Once a class is certified, it takes on a legal identity of its own, even in jurisdictional disputes. *See Payton*, 308 F.3d at 680–81 (citing, among other cases, *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)). The Ninth Circuit and the Supreme Court alike have held that after a class is certified, it "'acquires a legal status separate from the interest asserted by the class representative,' so that an Article III controversy . . . exists 'between a named defendant and a member of certified class.'" *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011) (other alterations omitted) (quoting *Sosna v. Iowa*, 419 U.S. 393, 399 (1975)). It can also be very difficult to divide disputes about standing from disputes about class certification. *See, e.g.*,

7

*Melendres v. Arpaio*, 784 F.3d 1254, 1261–64 (9th Cir. 2015).  "[T]here are cases where appropriate relief may be obtained through one broad suit, and it will be impossible to find a named plaintiff to match every defendant."  *Payton*, 308 F.3d at 681.  Should a group of similarly situated defendants be permitted to treat one group of people more harshly than another similarly situated group simply because that second group has not yet managed to obtain relief from a federal court?  *See id.*  The answer could be "no."

There are also good reasons for caution.  The Federal Rules of Civil Procedure "cannot alter a constitutional requirement," such as the standing requirement.  *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 63–66 (2d Cir. 2012).  The Ninth Circuit's decision in *La Mar* also predated several of the Supreme Court decisions that are now at the foundation of its case law.  *See Martinez*, 46 F.4th at 977–78 (Lee, J., concurring).  A broader rule might arguably open a "back door" to federal courts for class actions and "alter the allocation of power away from a democratic form of government."  *Id.* (first quoting *Allee v. Medrano*, 416 U.S. 802, 809 (1974) (Burger, C.J., concurring in part and dissenting in part), then quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

These questions will have to wait.  As was true in *Martinez*, the result is the same in this case whether the dispute is framed in terms of jurisdiction or class certification.  Nothing in Sundquest's complaint permits the Court to infer that his claims are typical of those that other people might raise against other insurers, even those affiliated with Allstate.

In *La Mar*, the Ninth Circuit suggested that there were two circumstances in which Rule 23 might permit a named plaintiff to represent people with claims against defendants who did not cause injuries to that named plaintiff: (1) "a conspiracy or concerted schemes between the defendants" and (2) situations in which the "defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious."  489 F.2d at 466.  Sundquist alleges merely "on information and belief," without elaboration or factual allegations in support, that the defendants "process claims according to the same . . . or identical . . . principles, policies, procedures, and practices" and "use one of the standardized contract forms adopted by Allstate."  (Doc. 1-1 ¶ 22.)  He does not allege, for example, any facts that could show some overarching

8

entity imposes a specific and mandatory requirement on each of the many affiliates he identifies. *Cf. Martinez*, 46 F.4th at 971 (rejecting analogy to *La Mar* because the state offered only "suggestions" and did not impose a "common rule"). He does not allege any facts that could support his theory that all of the entities he sued are part of a uniform conspiracy to deny claims uniformly for the same reasons. *Cf. Easter*, 381 F.3d at 962 (rejecting analogy to *La Mar* because nothing suggested there "a conspiracy or concerted scheme" among independent actors). As it stands, his pleadings hypothesize that the various Allstate affiliates take generally similar actions in parallel; he does not paint a plausible picture of a conspiracy between them. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564–70 (2007).

For these reasons, Sundquist has standing to pursue his individual claims and putative class claims against Allstate, but not against the other defendants identified in his complaint. The claims against these other defendants are dismissed without prejudice for lack of jurisdiction. The Court cannot exclude the possibility that more concrete or detailed factual allegations—or allegations by a different named plaintiff—could permit a potentially viable claim to proceed against other defendants under *La Mar* or *Payton*, discussed above. Sundquist may therefore file an amended or supplemental complaint within thirty days. *See* Fed. R. Civ. P. 15(a)(2)("The court should freely give leave [to amend] when justice so requires."); Fed. R. Civ. P. 15(d) (permitting supplemental complaints); *State of California v. United States Dep't of Lab.*, 155 F. Supp. 3d 1089, 1098 (E.D. Cal. 2016) (describing legal standard for supplemental complaints).

**CLASS ALLEGATIONS**

Because Sundquist has standing to pursue individual claims against Allstate, this Court has jurisdiction over the putative class claims against Allstate. *See Melendres*, 784 F.3d at 1261–62. Allstate moves to dismiss or strike those class allegations under Rules 12(f) or 23(d)(1)(D). (Doc. 9 at 30–35.) Rule 12(f) permits district courts to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Rule 23(d)(1)(D) gives district courts authority to "issue orders that . . . require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly."

9

Allstate cites the requirements of Rule 23(a) and (b) to support its motion.  It argues that Sundquist cannot adequately represent the proposed class under Rule 23(a) because he was not injured, that individualized issues make this case impossible to litigate on a classwide basis under Rule 23(b)(3), and that the proposed injunction class should not be certified under Rule 23(b)(2) because Sundquist's primary claim is for damages.  (Doc. 9 at 30–35.)

Motions to strike class allegations at the pleadings stage are disfavored.  *Thorpe v. Abbott Lab'ys, Inc.*, 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008).  "[O]ften the pleadings alone will not resolve the question of class certification" because "some discovery will be warranted."  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009).  "[T]he better and more advisable practice" is usually "to afford the litigants an opportunity to present evidence as to whether a class action [is] maintainable."  *Id.* (quoting *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977)).  But "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).  If it is clear "that a class action cannot be maintained on the facts alleged, a defendant may move to strike class allegations prior to discovery."  *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009).

Allstate's first argument in support of its motion to strike is that Sundquist does not have standing, did not suffer an injury, and cannot state a claim for relief.  (*See* Doc. 9 at 31–32.) Sundquist has standing to assert claims against Allstate, as discussed in the previous section of this order.  And as explained in the next section below, his complaint states claims for relief.

Allstate next contends that it is clear on the face of the complaint that individualized questions will predominate, which would prevent any class from being certified under Rule 23(b)(3).  It argues there will inevitably be disputes about the relative fault of the insured, uninsured or underinsured drivers; the causes of any injuries sustained; and the value of the resulting damages, citing the district court's order in *Salvador v. Allstate Property & Casualty Insurance Co.*, No. 19-2754, 2020 WL 7042843, *5 (D.D.C. Nov. 30, 2020).

The court's reasoning in *Salvador* persuasively demonstrates why that case was an unusual example of a proposed class that clearly fell short of Rule 23(b)(3) from the very start.

10

The plaintiffs alleged their insurer (a different Allstate entity) had essentially low-balled their losses and had misrepresented its claims process to potential clients. *See id.* at \*1. They proposed a class of "any policyholder or beneficiary whose uninsured motorist claim involved bodily injury and was not 'paid in full.'" *Id.* at \*5. Such a broad theory of harm would doubtlessly demand a separate investigation of each class member's injury, its severity, the reasonability of the insurer's analysis, and the amount of any damages due. *See id.* Beyond these problems, the complaint also identified no single advertising campaign or public statements that the whole class might have heard or read. *See id.*

This case is not so obviously individualized. Sundquist alleges Allstate has a common practice of applying a single offset for all workers' compensation payments, no matter what individual differences might separate one claimant from the next. (*See, e.g.*, Doc. 1-1 ¶¶ 175–77.) He alleges this practice violates the California Insurance Code and the terms of Allstate's policy in the same way in every case. (*See id.*) The validity of Allstate's allegedly violative practice is a common issue, one that could at least conceivably drive a class action forward. True enough, a variety of individualized disputes might make individual litigation the superior choice. As Allstate contends, for example, piecemeal disputes about each driver's liability and injuries may very well play a central role. (*See* Doc. 9 at 32–33.) But that is not clear on the face of the complaint. As is usually the case, then, at least some discovery is a necessary prerequisite to the class certification decision.

Finally, as noted, Allstate argues briefly that the Court should not entertain a potential injunction class under Rule 23(b)(2). (Doc. 9 at 35.) The complaint unambiguously requests an injunction directing Allstate to readjust the claims in question in compliance with its policy's terms and the governing state law. (Doc. 1-1 at 109, 117.) As Sundquist points out in opposition, "'reprocessing' injunctions are routinely found to be sufficient for class certification under Rule 23(b)(2)." *Des Roches v. Cal. Physicians' Serv.*, 320 F.R.D. 486, 509 (N.D. Cal. 2017) (collecting authority). The Court therefore denies the motion to strike Sundquist's class allegations.

///

**INDIVIDUAL CLAIMS**

Allstate also moves to dismiss Sundquist's individual claims on their merits for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive such a motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The Court's task in response to a Rule 12(b)(6) motion is a "context-specific" exercise that draws on "judicial experience and common sense." *Iqbal*, 556 U.S. at 678. at 679. The Court must make "all reasonable inferences in favor of the nonmoving party." *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)).

California's substantive insurance law applies to coverage disputes in diversity cases like this one. *Encompass Ins. Co. v. Coast Nat. Ins. Co.*, 764 F.3d 981, 984 (9th Cir. 2014). The starting point in that law is section 11580.2 of the California Insurance Code.

## I. The Insurance Code

Section 11580.2 regulates "uninsured" and "underinsured" motor vehicle coverage. *Rudd v. Cal. Cas. Gen. Ins. Co.*, 219 Cal. App. 3d 948, 953 (1990). As originally passed in the 1960s, section 11580.2 was designed to give drivers a minimum recovery from their own insurers if they were injured by someone who was "completely without insurance," i.e., an "uninsured" driver. *Id.* at 950. But damage "in excess of the often minimal insurance coverage purchased by the tortfeasor" could nonetheless go uncompensated, so in the 1980s, the legislature amended the statute to provide coverage for losses caused by "underinsured" drivers as well. *Id.* at 950–51. Today, although section 11580.2 defines "uninsured" and "underinsured" separately, it "treats uninsured and underinsured motor vehicles as synonymous" in many respects. *Id.* at 953. "It requires that both types of insurance be offered; it specifies the minimum amounts of such coverages which must be offered; and it specifies the type of language which must be employed effectively to waive or reduce the amounts of such coverages." *Id.* (citing Cal. Ins. Code § 11580.2(a)(1), (a)(2), (a)(3), (n)).

Section 11580.2 creates an "offset" system of coverage. *Viking Ins. Co. v. State Farm*

*Mut. Auto. Ins. Co.*, 17 Cal. App. 4th 540, 547–48 (1993) (quoting *Fagundes v. Am. Int'l Adjustment Co.*, 2 Cal. App. 4th 1310, 1315 (1992)).  This means the limit that is payable under the terms of a person's uninsured or underinsure motor vehicle policy "is reduced by all the amounts received from other sources."  *Id.* (quoting *Fagundes*, 2 Cal. App. 4th at 1315).  Amounts received from other sources are thus said to "offset" the total potential recovery.  *Id.* (quoting *Fagundes*, 2 Cal. App. 4th at 1315).  As California courts have put it, the goal of the state's system is not to provide coverage for all damages that go uncompensated after a crash with an uninsured or underinsured driver, nor "to place the insured in a better position than he would have occupied" if the other drive had been "properly insured," but rather "to provide the insured with the same insurance protections he would have enjoyed if the adverse driver had been properly insured."  *Rudd*, 219 Cal. App. 3d at 954–55 (emphasis omitted); *see also Viking*, 17 Cal. App. 4th at 547.  To this end, section 11580.2 includes several provisions describing the types of "offsets" or reductions an insurance carrier can or must apply.  Two of these provisions are at the root of Sundquist's coverage dispute with Allstate.

First, "[a]ny loss payable under the terms of the uninsured motorist endorsement or coverage to or for any person may be reduced . . . [b]y the amount paid . . . under any workers' compensation law . . . ."  Cal. Ins. Code § 11580.2(h)(1).  The word "may" in this subdivision shows that state law permits insurers to offer policies that offset workers' compensation benefits, but it does not require such an offset in every policy.  *See Akkerman v. Grange Ins. Ass'n*, 525 F. Supp. 3d 1122, 1125 (E.D. Cal. 2021) (citing *Waggaman v. Nw. Sec. Ins. Co.*, 16 Cal. App. 3d 571, 579 (1971)).  So if a policy does not include a specific provision conferring the right to deduct workers' compensation benefits, the insurer cannot rely on subdivision (h)(1) alone to justify a deduction.  *See id.*

Second, "the maximum liability of the insurer providing the underinsured motorist coverage shall not exceed the insured's underinsured motorist coverage limits, less the amount paid to the insured by or for any person or organization that may be held legally liable for the injury."  Cal. Ins. Code § 11580.2(p)(4).  This subdivision, in contrast with (h)(1), uses the mandatory word "shall."  So as a rule, an insurer's liability will not include "the amount paid to

the insured by or for any person or organization that may be held liable for the injury." *Id.*

Allstate argues the mandatory offset in subdivision (p)(4) includes payments for workers compensation benefits, like those in this case.  (Doc. 9 at 14.)  If that is true, Allstate may very well have been obligated by statute to make the disputed offsets in this case, regardless of the policy's terms.  Sundquist argues subdivision (h)(1) is the relevant provision, and he argues Allstate's interpretation of section (p)(4) is implausible.  (Doc. 12-1 at 19–20.)

Settling this disagreement is an exercise in statutory interpretation.  The overall goal of that exercise under California law is "to ascertain the intent of the Legislature so as to effectuate the purpose of the law."  *Viking*, 17 Cal. App. 4th at 546 (quoting *Rudd*, 219 Cal. App. 3d at 952).  The "words of the statute itself" are the starting point.  *Id.* (quoting *Rudd*, 219 Cal. App. 3d at 952).  They "must be construed in the context of the statutory framework as a whole, keeping in mind the policies and purposes of the statute, and where possible the language should be read so as to conform to the spirit of the enactment."  *Id.* (quoting *Rudd*, 219 Cal. App. 3d at 952).  "A construction which makes sense of an apparent inconsistency is to be preferred to one which renders statutory language useless or meaningless."  *Craft v. State Farm Mut. Auto. Ins. Co.*, 14 Cal. App. 4th 1284, 1291 (1993).

The "policies and purposes" of section 11580.2 include protecting people by offering them a minimum amount of compensation "for bodily injury caused by the actionable fault of another driver,"  *Hartford Fire Ins. Co. v. Macri*, 4 Cal. 4th 318, 324 (1992) (quoting *Fireman's Fund etc. Co. v. Ind. Acc. Com.*, 226 Cal. App. 2d 676, 677–78 (1964)).  Given that protective purpose, "doubtful language in the statute should be resolved in favor of the insured."  *Craft*, 14 Cal. App. 4th at 1291.  But as summarized above, the law's protective purpose has limits.  Because section 11580.2 is not designed to provide coverage for all losses that go uncompensated after a car crash, it should not be interpreted in a way that would "place the insured in a better position than he would have occupied" if the other driver had carried full insurance.  *Rudd*, 219 Cal. App. 3d at 954 (emphasis omitted).  The Legislature similarly "intended to prevent the insured from recovering twice for the same injury."  *Rangel v. Interinsurance Exch.*, 4 Cal. 4th 1, 8 (1992).  It also intended offsets in cases of workers' compensation payments to "shift the cost

14

of an industrial injury sustained by an employee, as the result of the negligence of an uninsured motorist, from the motoring public (who pay the premium for uninsured motorist coverage) to the employer or workmen's compensation carrier." *Id.* (quoting *Cal. State Auto. Assn. Inter–Ins. Bureau v. Jackson*, 9 Cal. 3d 859, 869 (1973)).

There is only one way to read subdivisions (h)(1) and (p)(4) coherently and in line with these purposes without depriving either one of them of effect. Under subdivision (h)(1), the legislature permitted—but it did not require—the parties to an uninsured and underinsured motorist policy to agree that the policy's limits would be reduced by any payments received under a workers' compensation policy. Subdivision (p)(4), by contrast, which imposes a mandatory offset in more generic terms, refers to other situations and other payments. If subdivision (p)(4) were interpreted to include payments under workers' compensation policies, subdivision (h)(1) would be superfluous, but only partially so, i.e., in cases of underinsured motorist coverage, not uninsured motorist coverage. That is because subdivision (p) states expressly that it "applies only when bodily injury is caused by an underinsured motor vehicle." It is unclear what reason the legislature could have to impose different limits on uninsured and underinsured motorist coverage. It has, after all, "amalgamated both types of coverage into a single coverage or endorsement." *Rudd*, 219 Cal. App. 3d at 953. The legislature certainly could have achieved this odd result if it had intended to do so. It could have referred expressly to workers' compensation policies in section (p)(4), like it did in subdivision (h)(1). But it did not.

The purposes of section 11580.2 also align with an interpretation of subdivision (p)(4) that does not make a workers' compensation offset mandatory. Interpreting the statute in this way avoids duplicative coverage by permitting insurers to issue policies that make offsets for workers' compensation payments. It favors insureds because it permits them to negotiate and pay for greater coverage if they wish.

Allstate argues that California courts have already decided the opposite is true. (*See* Doc. 9 at 14–15.) It first cites a footnote in the Court of Appeal's decision in *Rudd*. (*See id.* (citing 219 Cal. App. 3d at 955 n.7).) The Court of Appeal did not decide in *Rudd* whether offsets are required under subdivision (p)(4). It decided whether section 11580.2 as a whole "permits" a

15

workers' compensation offset, i.e., whether the insurer "may" offset its liability in this way. *Id.* at 951–52. The answer was yes: an insurer "may assert a subsection (h) setoff for the amount of workers' compensation benefits." *Id.* at 956. The cited footnote follows the Court of Appeal's observation that subdivision (p)—which, as noted, applies only to underinsurance motorist coverage—does not conflict with this holding. It would be "unnecessary" and "redundant" for subdivision (p) "to restate" the "permissible" language in subdivision (h)(1). *Id.* at 955 & n.7. That reasoning is sound and binding here. *See Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007). It also supports the interpretation above, which harmonizes subdivisions (h)(1) and (p)(4) and makes neither of them redundant of the other.

In the footnote Allstate cites, however, the Court of Appeal went further. It used language that was clearly intended to communicate a tentative observation only, not a holding. Workers' compensation payments, the Court wrote, "would appear" to qualify under subdivision (p)(4) as payments by "any person . . . legally liable." *Id.* (alteration in original). This "one line of dicta from an intermediate appellate court" is not a controlling expression of California law. *Gonzales v. California Dep't of Corr.*, 739 F.3d 1226, 1231 (9th Cir. 2014). It was not necessary to the Court of Appeal's conclusion, and the court did not recognize or address the conflict it would create between subdivisions (p)(4) and (h)(1).

Allstate next cites the Court of Appeal's unpublished opinion in *Scottsdale Indem. Co. v. Arnold*, No. F044244, 2004 WL 2809992 (Cal. Ct. App. Dec. 7, 2004). (Doc. 9 at 25–26.) Under the California Rules of Court, "an opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action." Cal. R. Ct. 8.1115(a). This rule is not binding in a federal court, so although Allstate may cite *Scottsdale*, it has no precedential value. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1223 n.3 (9th Cir. 2015). In other words, as federal district courts have often written, unpublished opinions by the California Court of Appeal can persuade, but they do not bind. *See Washington v. Cal. City Corr. Ctr.*, 871 F. Supp. 2d 1010, 1028 n.3 (E.D. Cal. 2012). *Scottsdale* is not persuasive. The Court of Appeal simply reiterated the footnote in *Rudd*, discussed above, and found that the language in the insurance policy before it

16

was "similar to" subdivision (p)(4). *See* 2004 WL 2809992, \*3.

To summarize this statutory rule, section 11580.2(h)(1) permits but did not require an offset "[b]y the amount paid . . . under any workers' compensation law" in Sundquist's case. The focus therefore shifts from the statute to Allstate's policy. Did the policy provide that Allstate could offset workers' compensation payments as section 11580.2(h)(1) permits, and if so, under what terms?

**II.     The Policy**

The parties agree the following policy language is controlling, but they disagree about what it means:

A. Coverage

1. We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "uninsured motor vehicle". The damages must result from "bodily injury" sustained by the "insured" caused by an "accident". The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the "uninsured motor vehicle".

. . .

D. Limits of Insurance

1. Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for all damages resulting from any one "accident" is the Limit Of Insurance for Uninsured Motorists Coverage shown in the Schedule or Declarations.

2. For a vehicle described in Paragraph b. of the definition of "uninsured motor vehicle", our Limit of Insurance shall be reduced by all sums paid because of "bodily injury" by or for anyone who is legally responsible, including all sums paid or payable under this policy's Covered Autos Liability Coverage.

3. No one will be entitled to receive duplicate payments for the same elements of "loss" under this coverage and any Liability Coverage form or Medical Payments Coverage endorsement attached to this Coverage Part.

We will not make a duplicate payment under this coverage for any element of "loss" for which payment has been made by or for anyone who is legally responsible.

We will not pay for any element of "loss" if a person is entitled to receive payment for the same element of "loss" under any workers' compensation, disability benefits or similar law.

Doc. 9-1 at 4–6.

Allstate argues it was entitled to offset workers' compensation payments to the four employees or their families under paragraph D.2.  (*See* Doc. 9 at 25–27.)  It argues workers' compensation payments are "sums paid because of 'bodily injury' by or for" someone "who is legally responsible."  (*Id.*)  Sundquist argues paragraph D.2 is about different types of payments and points instead to the last sentence in paragraph D.3 as the controlling language, i.e., that Allstate "will not pay for any element of 'loss' if a person is entitled to receive payment for the same element of 'loss' under any workers' compensation, disability benefits or similar law." (Doc. 12-1 at 15–23.)

The Court must resolve this dispute using California's rules for interpreting insurance policies.  *See Encompass*, 764 F.3d at 984.  Under these rules, insurance policies have "special features," but "they are still contracts to which the ordinary rules of contractual interpretation apply."  *Yahoo Inc. v. Nat'l Union Fire Ins. Co. etc.*, 14 Cal. 5th 58, 67 (2022) (quoting *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999)).  The Court must infer the parties' "mutual intention at the time the contract is formed" from "the written provisions of the insurance policy" alone, if possible.  *Id.* (quoting *Palmer*, 21 Cal. 4th at 1115).  "If the policy language is clear and explicit, it governs."  *Id.* (quoting *Palmer*, 21 Cal. 4th at 1115).  "If the terms are ambiguous," however, the court must "interpret them to protect the objectively reasonable expectations of the insured."  *John's Grill, Inc. v. The Hartford Fin. Servs. Grp., Inc.*, 16 Cal. 5th 1003, 1014 (2024) (quoting *Palmer*, 21 Cal. 4th at 1115).

"When coverage is in dispute, the initial burden is on the insured . . . to prove that its claim falls within the scope of potential coverage."  *Yahoo*, 14 Cal. 5th at 68.  The parties do not currently dispute that Sundquist's insurance claim fell within the basic scope of coverage delineated in paragraph A.1, quoted above.  He alleges he was an "insured" as an employee in his employer's "motor vehicle," and he alleges he suffered "bodily injury" in an "accident" with an underinsured driver.  (*See* Doc. 1-1 ¶ 67–68, 73, 202, 205.)  Sundquist has therefore carried his initial burden to plead that his insurance claim fell within the scope of potential coverage.

"If the insured establishes that the policy provides at least the potential for coverage, the

18

burden shifts to the insurer . . . to show the claim falls within one of the policy's exclusions" or to show otherwise that it has no liability under a clause limiting coverage. *Yahoo*, 14 Cal. 5th at 68. "[C]lauses limiting coverage are construed strictly against the insurer and liberally in favor of the insured." *Viking*, 17 Cal. App. 4th at 553. As noted, Allstate argues it was within its rights to offset the workers' compensation payments that the four employees or their families received under paragraph D.2. (Doc. 9 at 24.) It argues also that this language is unambiguous and imposes a limit on coverage that is distinct from the limits in paragraph D.3, citing the Court of Appeal's unpublished decision in *Scottsdale*, in this way rendering paragraph D.3 effectively irrelevant. (*Id.* at 24–25.)

The insurance policy in *Scottsdale* included nearly identical limits to those in paragraphs D.2 and D.3 of Allstate's policy, sharing even the same paragraph numbers. *See* 2004 WL 2809992, at *1. The court decided that paragraph D.2 was clear and unambiguous, that it was distinct from paragraph D.3, and that there was "nothing in the policy that can be read to subordinate the restrictions in section D.2 to the 'elements of loss' provisions in D.3." *Id.* at *2. For these reasons, the Court of Appeal concluded that it was not necessary to interpret paragraph D.3. *See id.* It nevertheless continued on in a footnote to explain how it was possible to read paragraph D.3 "as an additional limitation on, rather than a broadening of, coverage." *Id.* at *2 n.4. First, under paragraph D.2, the insurer could "deduct from its coverage or liability the *amounts paid* by or for any responsible parties when the vehicle is underinsured." *Id.* (emphasis in original). Second, under paragraph D.3, the insurer would "not *pay* for *any types* of loss paid by or for the responsible parties whether the vehicle is insured or uninsured." *Id.* (emphasis in original).

As noted above, because the Court of Appeal's opinion in *Scottsdale* was not published, its reasoning is not controlling, but Allstate may cite and this court may follow that reasoning if it is persuasive. *See Washington*, 871 F. Supp. 2d at 1028 n.3. There are reasons to doubt that the Court of Appeal's interpretation of the language in section D is reasonable, but even setting those doubts aside, there is a more fundamental fault in its analysis that deprives its reasoning of persuasive effect. As it wrote in the footnote Allstate quotes, "section D.3 *may* be read as an

additional limitation on, rather than a broadening of, coverage." (Doc. 9 at 26 (emphasis altered) (quoting 2004 WL 2809992, at *2 n.4).)  The court found it was possible, in other words, to read the language in a way that favored the insurer.  That is the beginning of the analysis that California law requires, not the end.  The California Supreme Court has instructed lower courts to read an insurance policy's terms in context, to give each part of the policy an effect, to use each clause to help interpret the others, to construe limiting provisions strictly, and then finally, if this analysis results in two reasonable interpretations, to protect the reasonable expectations of the insured by resolving the dispute against the insurer.  *See, e.g.*, *John's Grill*, 16 Cal. at 1013–14; *Yahoo*, 14 Cal. 5th at 67–68; *Palmer*, 21 Cal. 4th at 1115; *Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 501 (2005).  If an insured comes forward with a reasonable interpretation that conflicts with the insurer's proposed interpretation, and if the ordinary rules of contract interpretation do not resolve the resulting ambiguity, then the court adopts the insured's reading.  *Yahoo*, 14 Cal. 5th at 67.

Sundquist's conflicting interpretation of paragraph D is at least as reasonable as the interpretation Allstate proposes.  His interpretation begins with a juxtaposition of paragraphs D.2 and D.3.  Paragraph D.2 is the more general provision of the two.  It refers to "all sums paid by anyone who is legally responsible." (Doc. 9-1 at 5.)  Paragraph D.3 is more specific.  It refers to particular kinds of payments: those for a "'loss' under any workers' compensation, disability benefits or similar law." (*Id.* at 6.)

It is a "venerable principal of contract interpretation that specific language controls general language." *Brady v. Bayer Corp.*, 26 Cal. App. 5th 1156, 1178 (2018).  This rule applies equally to insurance policies.  "[A] specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, even though the latter, standing alone, would be broad enough to include the subject to which the more specific provision relates." *Kavruck v. Blue Cross of Cal.*, 108 Cal. App. 4th 773, 781 (2003) (quoting *Gen. Ins. Co. v. Truck Ins. Exch.*, 242 Cal. App. 2d 419, 426 (1966)).  In this case, then, even if the "general provision" in paragraph D.2 is "broad enough" to cover workers' compensation payments, "the more specific provision" in paragraph D.3 will govern.  An insured might therefore believe quite reasonably

20

that when it comes to workers compensation, paragraph D.3 would determine whether Allstate could limit its liability, not paragraph D.2, at least in the event of any inconsistency between the two.

Those paragraphs are not consistent.  Paragraph D.3 sets up a different calculation than paragraph D.2.  Allstate's policy says that it will not pay "for any element of 'loss' if a person is entitled to receive payment for the same element of 'loss'" under a workers' compensation statute.  (Doc. 9-1 at 6.)  This calculation is a good fit for a workers' compensation statute that, like California's, "does not provide the full range of relief available in a personal injury tort action," including "noneconomic damages such as pain and suffering." *Orosco v. Sun-Diamond Corp.*, 51 Cal. App. 4th 1659, 1664 (1997).  If some "elements" of the insured's losses were covered by the workers compensation statute, but other "elements" of the insured's losses were not covered, then paragraph D.3 implies that Allstate would pay only for the full value of any "elements" of the insured's loss that were not covered by the workers' compensation payments, such as pain and suffering.  *See Akkerman*, 525 F. Supp. at 1127 & n.2 (collecting relevant authority).  This calculation differs from the simpler calculation in paragraph D.2.  Under that paragraph, Allstate will simply reduce its limits for "all sums paid by or for anyone who is legally responsible."  (Doc. 9-1 at 5.)

As Sundquist also points out, Allstate's reading of paragraph D.2 would always lead to a reduction for workers' compensation payments as a practical matter, regardless of what paragraph D.3 might require.  (Doc. 12-1 at 18–19.)  Allstate disagrees based on its hypothesis that the two paragraphs are not duplicative when "there were limits left after applying the language in section D.2."  (Doc. 9 at 27.)  In other words, if the worker's compensation payments were less than the policy limits, then Allstate believes paragraph D.3 could lead to more offsets.  (*See id.* ("In this case, because the workers' compensation benefits paid of $247,287.55 exceed Allstate's UIM limits of $70,000, there are no limits left.").)  Allstate does not say what those additional offsets might be.  It is difficult to imagine how those additional offsets could have anything to do with workers' compensation benefits; those payments were already offset under paragraph D.2.

Allstate does suggest, however, again citing the Court of Appeal's unpublished opinion in

21

*Scottsdale*, that an insurer could refuse to pay for some "types of loss" if workers' compensation payments compensated a portion of that "type of loss." (*Id.* (citing 2004 WL 2809992, at \*4).) This interpretation implies rather dubiously that an insurer could make duplicative offsets, or even offsets beyond those that the legislature permitted insurers to make in section 11580.2. In published opinions, the Court of Appeal has agreed that section 11580.2 does not permit such unfair and duplicative offsets. *See, e.g.*, *Rudd*, 219 Cal. App. 3d at 956 n.10. If insurers could rely on paragraph D.2 in all cases, they could potentially bypass the more specific requirements of paragraph D.3 and section 11580.2(h)(1), as Sundquist contends Allstate has done here. (*See* Doc. 12-1 at 15–16, 18.)

In sum, it is reasonable to interpret paragraphs D.2 and D.3 as permitting distinct offsets, first by the amounts paid by or for "anyone who is legally responsible" under paragraph D.2, such as by the underinsured driver's insurer; and second by the amounts of any workers' compensation payments, under paragraph D.3. Because this interpretation is reasonable and favors Sundquist as the insured, the court must adopt it. Both California statutory law and the policy therefore gave Allstate permission to limit its liability by offsetting "any element of 'loss' if a person is entitled to receive payment for the same element of 'loss' under any workers' compensation, disability benefits or similar law." (Doc. 9-1 at 6.)

This conclusion finally sets up the decisive question for resolving Allstate's motion to dismiss for failure to state a claim: has Sundquist stated a claim for breach of contract or bad faith based on the offset that Allstate allegedly imposed?

**III.     The Disputed Offset**

Allstate ultimately justified its refusal to pay policy benefits to Sundquist based on an offset of approximately $250,000, i.e., for the full value of all workers' compensation payments to the four coworkers or their families, more than double the $100,000 policy limit. (Docs. 1-1 ¶ 118; 9-1 at 5.) This justification conflicted with the policy in two ways.

First, paragraph D.3 permitted an offset not simply for the full value of the workers' compensation payment, but rather "for any element of 'loss' if a person is entitled to receive payments for the same element of 'loss'" under a workers' compensation law. (Doc. 9-1 at 6.)

22

As another judge of this Court explained persuasively in a similar case, the plain and ordinary meaning of this language shows "that the total loss is to be divided into parts, which could include medical costs, lost wages, disability payments and pain and suffering." *Akkerman*, 525 F. Supp. 3d at 1127. "If any of these elements were covered by workers' compensation, then [the insurer] could subtract the workers' compensation amount from the policy limit for that element." *Id.* "[I]f any elements of loss were not covered," however, then the insurer "would be required to pay the full amount for that element (or elements) up to the policy limit," after subtracting any other permissible or mandatory offsets. *Id.*; *see also, e.g.*, *Neely v. Builders Mut. Ins. Co.*, No. 24-45, 2025 WL 1570976, at *5 & n.3 (N.D. Miss. June 3, 2025) (agreeing with and applying this same interpretation). In contrast with these policy terms, Sundquist alleges Allstate deducted the full amount paid, without analyzing whether that amount was paid for any particular element or elements of loss. Allstate does not defend its offsets under the terms of paragraph D.3. As noted above, it contends incorrectly that paragraph D.3 is irrelevant, not that it complied with that paragraph.

Second, Allstate's offset went beyond what section 11580.2(h)(1) permitted. A different California district court explained why in another case against Allstate itself several years ago. Section 11580.2(h)(1) does not permit an insurer to reduce the amounts it pays to one person by the amounts of any workers' compensation payments that were made to a different person. *See generally Anthony v. Allstate Ins. Co.*, No. 10-01135, 2010 WL 11579809 (C.D. Cal. Sept. 24, 2010). That interpretation is "not only logically unsound, but also wholly unsupported by the purposes of section 11580.2(h)(1)." *Id.* at *4. The relevant purposes of section 11580.2 are, as summarized above, to offer minimal protections to people on state roads, to prevent double recoveries, and to shift workplace losses from the "motoring public" to the relevant employer or workers' compensation carrier. *See Macri*, 4 Cal. 4th at 324; *Rudd*, 219 Cal. App. 3d at 954; *Rangel*, 4 Cal. 4th at 8. Reducing payments to one person based on workers' compensation payments to a different person would undermine the statute's purpose to afford minimal protections; a payment to one person for that person's losses does not duplicate a second payment to a second person for that person's independent losses; and rather than shifting payments to

23

employers or workers' compensation carriers, Allstate's preferred interpretation simply generates a "windfall" for itself. *See Anthony*, 2010 WL 11579809, at *3.

If a policy provision is inconsistent with a governing statute, the court must "enforce the provision consistent with the governing statute," in this case section 11580.2(h)(1). *See State Farm Fire & Cas. Co. v. Superior Ct.*, 210 Cal. App. 3d 604, 610 (1989). So even if the terms of Allstate's policy permitted it to impose the offset it did, that policy language could not be enforced under section 11580.2(h)(1).

Allstate argues in the alternative that even if it was wrong to impose the full $250,000 offset—i.e., if Allstate was instead required, as Sundquist alleges, to make individual offsets against the $70,000 policy limit that remained after the $30,000 payment from the underinsured driver—Sundquist could not prove that he was entitled to any policy benefits. (*See* Doc. 9 at 27–38.) This alternative argument does not account for Allstate's alleged failure to analyze the "elements" of loss under paragraph D.3. It also depends on the inference that Sundquist would have agreed to receive only 33% of the remaining $70,000, i.e., the proportion of the $30,000 payment he agreed to accept after mediation with his coworkers or their families. (*See id.* at 28.) That is an inference against Sundquist's interests. At this stage, the Court must make "all reasonable inferences in favor" of Sundquist. *Boquist*, 32 F.4th at 773 (quoting *Retail Prop. Tr.*, 768 F.3d at 945).

Allstate also argues a proportional allocation would implement its duty to treat all of its insureds equally and in good faith, including all of the coworkers and their families. (*See* Doc. 13 at 11.) Although one can hardly quibble with the assertion that Allstate must always act in good faith, Allstate does not cite any authority to show how that duty of good faith would apply in these circumstances. The case it cites involved excess insurance. (*See id.* (citing *Schwartz v. State Farm Fire & Cas. Co.* 88 Cal. App. 4th 1329, 1337–38 (2001)).) Section 11580.2 does not create a system of excess insurance coverage. *See, e.g.*, *Macri*, 4 Cal. 4th at 328.

For these reasons, Sundquist has stated a claim for breach of contract, i.e., that Allstate denied benefits in violation of the policy's terms. Allstate's arguments for dismissal of Sundquist's bad faith claim are derivative of its arguments for dismissal of his contract claim.

24

(*See* Doc. 9 at 4, 28–29.)  Its motion to dismiss both claims is therefore denied.

## CONCLUSION

The motion to dismiss for lack of jurisdiction (Doc. 9) is **GRANTED IN PART**.  On his current allegations, Sundquist does not have standing to pursue claims against entities other than Allstate itself.  The motion at Doc. 9 is otherwise **DENIED**.  Sundquist may file an amended complaint within thirty days.

IT IS SO ORDERED.

Dated:    **February 28, 2026**

UNITED STATES DISTRICT JUDGE

25